KAREN LECRAFT HENDERSON, Circuit Judge,
dissenting:
We must decide whether the Environmental Protection Agency (EPA) may temporarily defer regulation of biogenic carbon dioxide (C02) emissions against a backdrop of uncertain but expanding scientific knowledge and rapid regulatory changes. Deferral for C02 Emissions from Bioenergy, 76 Fed.Reg. 43,490 (July 20, 2011) (Deferral Rule). I believe EPA can — and should — defer regulation until it has the time it says it needs to study and resolve the issue it is charged with regulat *416 ing. I would therefore uphold the Deferral Rule. Alternatively, given that the Deferral Rule expires or will be superseded in a matter of months — and by then EPA will have at least crystallized the issue before us — we should hold the case in abeyance as unripe. Accordingly, I respectfully dissent.
I.
The Deferral Rule delays for three years — from July 20, 2011 until July 21, 2014 — the EPA’s factoring in of biogenic C02 emissions “when determining whether a stationary source meets the” emissions thresholds for permitting under the Prevention of Significant Deterioration (PSD) and Title V permitting systems of the Clean Air Act (CAA), 42 U.S.C. §§ 7401 et seq. See Deferral Rule, 76 Fed.Reg. at 43,492. In so deferring, EPA has used, correctly, I believe, the long-recognized step-at-a-time regulatory procedure. This procedure recognizes the reality and complexity of administrative regulation. “In an ideal world ... agencies would act only after comprehensive consideration of how all available alternatives comported with a well-defined policy objective.... ” Nat’l Ass’n of Broadcasters v. FCC, 740 F.2d 1190, 1210 (D.C.Cir.1984). Nonetheless, “administrative action generally occurs against a shifting background in which facts, predictions, and policies are in flux and in which an agency would be paralyzed if all the necessary answers had to be in before any action at all could be taken.” Id. Thus, “agencies have great discretion to treat a problem partially” and we will “not strike down [a regulation] if it [is] a first step toward a complete solution, even if we thought it ‘should’ ” have been finished. City of Las Vegas v. Lujan, 891 F.2d 927, 935 (D.C.Cir.1989). Moreover, “nothing in the [Administrative Procedure Act] precludes an agency from collecting data and monitoring real-world experience with regulatory standards before adopting new standards governing periods of time far into the future — especially in cases, as here, that involve unpredictable technological change. Indeed, gathering evidence before making a long-term decision is eminently sensible.” Pub. Citizen, Inc. v. Nat’l Highway Traffic Safety Admin., 374 F.3d 1251, 1263 (D.C.Cir.2004); see also id. at 1262-63 (agency’s temporarily declining to make crash test requirements stricter was not arbitrary and capricious because it “offered rational reasons for adopting an ‘interim final rule’ establishing the unbelted crash test speed through August 2006 only” while it undertook “multiyear effort to obtain additional data”).
The Deferral Rule must be read in light of the fact that EPA did not regulate greenhouse gases (GHGs) under the CAA at all until the end of 2009, see Endangerment and Cause or Contribute Findings for Greenhouse Gases, 74 Fed.Reg. 66,496 (Dec. 15, 2009), and did not regulate them under PSD and Title V until 2011, see Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 Fed.Reg. 31,514, 31,521 (June 3, 2010) (Tailoring Rule). By postponing regulation of biogenic C02 emissions under PSD and Title V, the Deferral Rule simply keeps in place the pre-2011 status quo. The question, then, is whether the petitioners can compel EPA to act before July 21, 2014.[1]
*417 Although the step-at-a-time doctrine is “pragmatic” and cannot be “captured in a single doctrinal formulation,” we ask two questions when an agency uses it to “defer resolution of problems.” Nat’l Ass’n of Broadcasters, 740 F.2d at 1210. First, we ask whether the agency (1) has “made some estimation, based upon evolving economic and technological conditions, as to the nature and magnitude of the problem it "will have to confront when it comes to resolve the postponed issue”; and (2) “whether it was reasonable, in the context of the decisions made in the proceeding under review, for the agency to have deferred the issue.” Id. at 1210-11. Regarding the second question, “postponement will be most easily justified when an agency acts against a background of rapid technical and social change and when the agency’s initial decision as a practical matter is reversible should the future proceedings yield drastically unexpected results.” Id. at 1211; see also Massachusetts v. EPA 549 U.S. 497, 527, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (“[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.”). I believe EPA’s rationale for the Deferral Rule easily fits within this framework.
EPA has reasonably attempted to balance its acknowledged CAA duty to regulate GHGs with the reality that both EPA itself as well as other permitting authorities have limited resources and experience in this area. The Tailoring Rule, which EPA promulgated in 2010, created a phase-in process whereby, at first, only the largest GHG emitters would be subject to PSD and Title V on the basis of GHG emissions. Tailoring Rule, 75 Fed.Reg. at 31,516. The phase-in was necessary both to alleviate high costs to permitting authorities, id. at 31,533, and to give EPA time to decide how to permanently implement GHG regulation, id. at 31,526. EPA promulgated the Deferral Rule because of similar cost and scientific uncertainty. Specifically, EPA did not know in 2011 which, if any, biofuel feedstocks cause a net increase in atmospheric C02 levels when used as fuel for a stationary source. Deferral Rule, 76 Fed.Reg. at 43,492. EPA was concerned that, if it regulated all sources’ biogenic C02 emissions without taking net increase vel non into account, its regulation of the sources could result in high cost but negligible benefit.[2] EPA also concluded that immediate, one-size-fits-all regulation of biogenic C02 could be counterproductive by discouraging the construction of low-net-carbon stationary facilities. Id. at 43,496. Absent deferral, EPA concluded, permitting authorities — primarily, states — would face a heavy administrative burden due to, inter alia, the need to take the carbon cycle into account in determining best available control technology (BACT) during the permitting process. *418 See id. at 43,492; see also id. at 43,496 (“[T]he extensive workload associated with analyzing and accounting for biogenic C02 emissions as part of processing permit applications from biomass facilities justifies exempting those sources for a period of time.... ”). While EPA attempted to alleviate the administrative burden by promulgating interim guidance to help permitting authorities conduct BACT analysis for biogenic C02 emissions — explaining that in some instances, combustion of biomass can be considered BACT — the case-by-case analysis that permitting authorities, without the Deferral Rule, would be required to undertake immediately “would likely be prohibitively time-consuming and complex.” EPA Office of Air & Radiation, Guidance for Determining Best Available Control Technology for Reducing Carbon Dioxide Emissions from Bioenergy Production 23 (Mar.2011), http://www.epa. gov/nsr/ghgdoes/bioenergyguidance.pdf. Accordingly, EPA promulgated the Deferral Rule as an “initial step toward full compliance” with the statutory mandate to regulate GHGs. Deferral Rule, 76 Fed. Reg. at 43,498. The Deferral Rule expires on July 21, 2014, at which time biogenic C02 emissions will automatically be treated like all other C02 emissions unless, on or before that date, EPA “undertake[s] additional rulemaking to clarify the applicability of PSD and Title V permitting requirements.” Id. (citing Grand Canyon Air Tour Coalition v. FAA, 154 F.3d 455, 476-77 (D.C.Cir.1998)); see also id. at 43,494 (quoting Massachusetts, 549 U.S. at 524, 127 S.Ct. 1438 (agencies may implement regulatory programs over time, “refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed.”)). In the meantime, EPA planned to study the science and ultimately either establish an appropriate carbon accounting framework for biogenic C02 emissions or, to repeat, allow the Deferral Rule to expire and treat biogenic C02 emissions like other C02 emissions.
My colleagues attack the Deferral Rule because it “nowhere offers an interpretation of the Clean Air Act that would allow the agency to treat biogenic carbon dioxide sources differently.” Maj. Op. 409-10. But EPA is not permanently treating biogenic C02 emissions differently. As the Deferral Rule explains, EPA believes, based on the evidence currently in its possession, that further study may support a decision to give special treatment to some biogenic emissions. Deferral Rule, 76 Fed.Reg. 43,496; see also id. at 43,499 (“EPA believes based on information currently before the Agency that at least some biomass feedstocks ... have a negligible impact on the net carbon cycle, or possibly even a positive net effect.”). If further study does not bear this out, EPA has implicitly acknowledged that it will treat biogenic C02 emissions as it does other C02 emissions. Cf. id. at 43,498 (“[EPA] will be using the three-year deferral period to better understand the science associated with biogenic C02 emissions and to explore whether or not a Permanent exemption is permissible.... ” (emphasis added)).[3]
*419 To be sure, in Coalition for Responsible Regulation v. EPA, 684 F.3d 102 (D.C.Cir.2012), we held that “once the Tailpipe Rule set motor-vehicle emission standards for greenhouse gases, they became a regulated pollutant under the Act, requiring PSD and Title V greenhouse permitting.” Id. at 115. But, just as EPA proceeded gradually in regulating GHGs under the Tailoring Rule, EPA has delayed its regulation of a specific GHG via the Deferral Rule.[4] The fact that EPA is required to take action does not preclude it from phasing in the action using the step-at-a-time method. In Grand Canyon Air Tour, the Congress required the Federal Aviation Administration (FAA), within 120 days of enactment of the Overflights Act, to “prepare and issue a final plan for the management of air traffic in the air space above the Grand Canyon.” See 154 F.3d at 460. After the FAA promulgated only interim measures, the Grand Canyon Trust challenged it as “too little” and “too late.” Id. at 473. We rejected its challenge, declaring that, although “it would be arbitrary and capricious for an agency simply to thumb its nose at Congress and say — without any explanation — that it simply does not intend to achieve a congressional goal on any timetable at all.... the FAA has not taken that course here. It has never defended the Final Rule as the sole means for [satisfying the statute], but only as the first of three steps.” Id. at 477; cf. Ala. Power Co. v. Costle, 636 F.2d 323, 357 (D.C.Cir.1979) (“Certain limited grounds for the creation of exemptions are inherent in the administrative process, and their unavailability under a statutory scheme should not be presumed, save in the face of the most unambiguous demonstration of congressional intent....”). While the CAA requires EPA to regulate C02, it does not foreclose, as one step toward full compliance, EPA’s deferring regulation of a unique type of C02 in order to study whether EPA can — and should — treat it differently. EPA does not defend the Deferral Rule as the sole or final means of dealing with biogenic C02 emissions nor has it thumbed its nose at the Congress. By July 21, 2014, EPA will take its next step — either by regulating biogenic C02 emissions like other C02 emissions by default (ie., the expiration of the Deferral Rule) or by handling biogenic C02 emissions specifically.
The necessary implication of the majority opinion is that, no matter the results of EPA’s study, EPA lacks authority to treat biogenic C02 emissions differently from other emissions. The CAA defines a major emitting source (ie., a source subject to PSD and Title V permitting requirements) as a source that “emit[s] or [has] the potential to emit” above-threshold amounts of a regulated pollutant “from” the source. 42 U.S.C. § 7479(1). The petitioners believe, and my colleagues apparently agree, this language precludes EPA from considering “off-site” factors, such as the carbon cycle of the biomass used as a source’s fuel, in determining whether the source is subject to PSD. But the language has not precluded EPA from recognizing de minimis exceptions from the statute. Under the de minimis doctrine, “[cjourts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort.” Ala. Power, 636 F.2d at 360. Unless the Congress has been “extraordinarily rigid,” we will uphold an exemption from the statute’s literal terms “when the burdens of regulation *420 yield a gain of trivial or no value.” Id. at 360-61. PSD and Title V are meant to protect against harm resulting from the emission of regulated pollutants, see, e.g., 42 U.S.C. § 7470, and EPA has found that GHGs such as C02 cause harm by accumulating in excess amounts in the atmosphere, see, e.g., Tailoring Rule, 75 Fed. Reg. at 31,519. If EPA’s review shows, however, that the combustion of certain biomass feedstocks has no effect on — or even reduces' — atmospheric C02 levels, EPA could then use this information to support a de minimis exception to the regulation of certain biogenic C02 emissions. Cf. Ala. Power, 636 F.2d at 330 (“[T]he application of BACT requirements to the emission of all pollutants ... no matter how miniscule ... could impose severe administrative [and economic] burdens .... [T]he proper way to resolve this difficulty is to define a de minimis standard .... ”). Exempting from regulation a source with a negligible — and particularly, a beneficial — effect on atmospheric C02 levels would be perfectly consistent with the overarching PSD and Title V permitting regime — a regime which expressly does not regulate “minor” sources that cause little harm because they release below-threshold levels of pollutants. See 42 U.S.C. §§ 7479(1), 7661(2), 7602(j). Given the availability of a de minimis exception, it is not as though, as the majority necessarily assumes, that the Deferral Rule delays the inevitable.[5]
In sum, EPA’s decision to stop and think before regulating in a complex — and changing — area is eminently reasonable.
II.
Alternatively, under the prudential ripeness doctrine, I believe we should not have reached the merits of this case. The ripeness doctrine prevents the court from prematurely adjudicating a dispute. Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The doctrine comes “from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.” Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). “The ripeness doctrine, even in its prudential aspect, is a threshold inquiry....” In re Aiken Cnty., 645 F.3d 428, 434 (D.C.Cir.2011). The court stays its hand so the “administrative process [can] run its course before binding parties to a judicial decision.” Am. Petroleum Inst. v. EPA, 683 F.3d 382, 386 (D.C.Cir.2012) (challenge to EPA rule continuing to regulate certain materials held unripe because EPA subsequently issued NPRM significantly changing regulatory scheme). This doctrine gives “the challenging party [time] to convince the agency to alter a tentative position,” “provides the agency an opportunity to correct its own mistakes and to apply its expertise,” narrows the legal and factual issues at play and “comports with our theoretical role as the governmental branch of last resort.” Id. at 386-87 (quotation marks omitted). It thus “ensures that Article III courts make decisions only when they have to, and then, only once.” Id. at 387.
We consider two factors in assessing prudential ripeness: (1) the “fitness of the issues for judicial decision” and (2) “the *421 extent to which withholding a decision will cause hardship to the parties.” Id. (quotation marks omitted).

A. Fitness for Review

The first factor — fitness—is “meant to protect the agency’s interest in crystallizing its policy before that policy is subjected to judicial review and the court’s interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.” Id. (quotation marks omitted). We must consider, inter alia, “whether [the issue] is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency’s action is sufficiently final.” Id. (quotation marks omitted). An issue is particularly unfit for review if, by staying our hand temporarily, we need never address it. See Nat’l Treasury Emps. Union v. United States, 101 F.3d 1423, 1431 (D.C.Cir.1996). We
decline to review “tentative” agency positions because doing so “severely compromises the interests” the ripeness doctrine protects: “The agency is denied full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, the integrity of the administrative process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position.”
Am. Petroleum Inst., 683 F.3d at 387 (quoting Pub. Citizen Health Research Grp. v. Comm’r, FDA, 740 F.2d 21, 31 (D.C.Cir.1984)).
The Deferral Rule — a temporary rule that expires or will be replaced by July 21, 2014 — is not fit for review. First, by staying our hand, we would give the petitioners an opportunity to convince EPA to promulgate a rule more to their liking. If EPA promulgated such a rule, or simply allowed the Deferral Rule to expire on July 21, 2014, the petitioners’ challenge could be resolved. See also Tex. Indep. Producers & Royalty Owners Ass’n v. EPA, 413 F.3d 479, 483 (5th Cir.2005) (EPA decision to defer permit requirements for certain oil and gas construction sites unripe because “[g]iven that EPA has specifically stated its intent to examine, during the Deferral Period, the issue of how best to resolve questions ... regarding section 402(i )(2) of the Clean Water Act, any interpretation we would provide would necessarily prematurely cut off EPA’s interpretive process” (quotation marks omitted)).
Second, even assuming EPA issues a superseding rule to which the petitioners object, the Deferral Rule will crystallize the issues raised by their challenge. See, e.g., Am. Petroleum Inst., 683 F.3d at 388 (“In the ongoing rulemaking, EPA could change its mind and keep the transfer-based exclusion, in which case the issue goes away; or, if EPA stays the course and abolishes the transfer-based exclusion, the dispute will become concrete and straightforward.”); Nat’l Treasury, 101 F.3d at 1431 (“[W]hile the broad legal theory advanced by appellants may be as complete as it ever will, the facts upon which its resolution may depend are not ‘fully crystallized’____”). The current dispute is whether EPA may postpone regulatory action based on insufficient information. If EPA promulgated a superseding rule exempting biogenic C02 from regulation, the dispute would be whether EPA may promulgate a permanent (or at least more crystallized) exemption. See Deferral Rule, 76 Fed.Reg. at 43,492-93; see also Am. Petroleum Inst., 683 F.3d at 387 (finding lack of ripeness when “EPA responds that the pyrophoric properties of *422 the catalysts warrant further consideration to make sure they will not be discarded during transfer”).[6]
To be sure, “an agency can[not] stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way.” Am. Petroleum Inst, 683 F.3d at 388. While EPA has not yet proposed a final rule, it has also not engaged in a “thinly veiled attempt to evade review,” id., but instead committed itself to act by a date certain — July 21, 2014. See Oral Arg. Tr. 28-29 (Apr. 8, 2013) (EPA’s Science Advisory Board has issued final report now being analyzed); see also Wheaton Coll. v. Sebelius, 703 F.3d 551, 552 (D.C.Cir.2012) (“We take the government at its word and will hold it to it.”).
For the foregoing reasons, I believe the Deferral Rule is not fit for review at this time.

B. Hardship to the Parties

“To outweigh the[] institutional interests in the deferral of review, any hardship caused by that deferral must be immediate and significant. Considerations of hardship that might result from delaying review will rarely overcome the ... fitness problems inherent in attempts to review tentative positions.” Am. Petroleum Inst., 683 F.3d at 389 (emphases added) (quotation marks omitted).
The petitioners argue, and my colleagues agree, Maj. Op. 407-08, that the hardship caused by the Deferral Rule is especially serious because the Deferral Rule could result in a “permanent” exemption from PSD permitting. Specifically, a stationary source constructed during the deferral period without obtaining a PSD permit (because of its temporary biogenic C02 exemption) could, in theory, escape permitting forever because a PSD permit would then be required only if the source is modified. See 42 U.S.C. § 7475(a). It is possible, then, that even if EPA decides to regulate biogenic C02 emissions like all other C02 emissions, a source constructed during the deferral period would never need to obtain a PSD permit if it remains unmodified.
The Deferral Rule does not open the floodgates as the petitioners and my colleagues fear. It allows a source to avoid PSD permitting only if (1) it has the potential to emit C02 as a result of biogenic emissions; (2) its potential to emit biogenic C02 exceeds Tailoring Rule thresholds; (3) it is not otherwise subject to PSD permitting based on its potential to emit other pollutants or non-biogenic C02 emissions; and (4) it is able to obtain a minor source (non-PSD) permit and commence construction[7] no later than July 21, 2014. And a source could permanently avoid PSD permitting only if it met the above requirements and never underwent a “major modification determination.” See De *423 ferral Rule, 76 Fed.Reg. at 43,499.[8] At oral argument, the petitioners were able to name only one source — a facility located in Allendale, South Carolina — that has been able to avoid PSD permitting “in direct reliance on” the Deferral Rule. Oral Arg. Tr. 5-6, 10. The intervenors describe the number of sources that could take advantage of the Deferral Rule as “a handful,” Oral Arg. Tr. 32. The petitioners submitted with their opening brief the declaration of Ranajit Sahu, an environmental, mechanical and chemical consultant, listing eight sources he reviewed that had obtained “minor source” (non-PSD) permits but “[e]scape[d] PSD [d]ue to the Biomass Exemption:” the Allendale facility plus seven others. Sahu Decl. at 14, 20-24. Six of them, however, obtained their minor source permits before the Deferral Rule was promulgated. Compare Sahu Decl. 22-24 (referencing Biogreen, Concord, Dorchester, Kershaw, Kamath Falls, Mancelona and Menominee facilities), with Sahu Decl. 5 (Biogreen obtained permit on December 15, 2010; Dorchester and Kershaw obtained permits on June 30, 2011; Klamath Falls obtained permit on December 30, 2010; Mancelona obtained permit on February 9, 2010; and Menominee obtained permit on May 11, 2011). If any of these sources commenced construction before July 2011, as is likely, the Deferral Rule would not affect that source because no source was subject to PSD based solely on C02 emissions before that date.[9]
To sum up, not only is this case unfit for review but the hardship of which the petitioners complain is hyperbolically overblown. The Deferral Rule does not deregulate scores of polluters.[10] Instead, it temporarily maintains the heretofore longtime status quo[11] for a limited number of *424 stationary sources that — until July 1, 2011 — had never been subject to regulation as a major source under PSD. Given these circumstances, and our role as “the governmental branch of last resort,” Aiken Cnty., 645 F.3d at 434, I believe we should deny the petition; in the alternative, we should hold the case in abeyance pending either the expiration of the Deferral Rule on July 21, 2014 or EPA action taken by that date.[12]

. Our review is highly deferential. See Interstate Natural Gas Ass’n of Am. v. FERC, 285 F.3d 18, 57 (D.C.Cir.2002) (“The policy originates in past decisions; FERC did not here decide to continue it, in the sense of confronting the substance and making an affirmative decision; it decided only that it would defer substantive treatment to a different — and necessarily later — context. In essence, then, the claim is of a violation of the [Administrative *417 Procedure Act]'s mandate that an agency decide matters within a reasonable time, and calls on us to compel agency action unlawfully withheld or unreasonably delayed. Our review is [therefore] highly deferential.” (quotation marks and citations omitted)).

. Earlier, EPA had predicted that, had it not adopted the Tailoring Rule's phase-in approach, permitting authorities would have faced a 140-fold increase in PSD permitting activity, or $1.5 billion in additional annual costs; and a 400-fold increase in Title V permitting activity, or $21 billion in additional annual costs. Tailoring Rule, 75 Fed.Reg. at 31,539-40. Even under the phase-in approach, EPA projected a 42% increase in administrative costs per year. Id. at 31,540, Table V-l. In the Deferral Rule, EPA reasoned that "requiring regulation of biogenic sources of C02 at this time may,” inter alia, "exacerbated the regulatory burdens ... the Tailoring Rule was intended to avoid.” Deferral Rule, 76 Fed.Reg. at 43,499.

. Contrary to my colleagues’ suggestion, the step-at-a-time doctrine does not require that an agency articulate precisely what constitutes full compliance with the statute at the time it takes an incremental step. Compare Maj. Op. 410 (criticizing EPA because "we simply have no idea what EPA believes constitutes 'full compliance’ with the statute”), with Pub. Citizen, 374 F.3d at 1263 (permitting agency to delay "a final decision regarding the maximum test speed for unbelted dummy testing” until agency completed gathering information and analysis). The rationale for a deferral period is that delay is necessary to allow the agency to determine what it is un *419 able to determine at the time, i.e., full compliance with a statutory mandate.

. In Coalition for Responsible Regulation, we rejected a challenge to the Tailoring Rule, albeit on lack of standing. 684 F.3d at 113-14.

. Moreover, to the extent it could be shown that the CAA is so "extraordinarily rigid” as to bar EPA from considering off-site activity in determining a stationary source’s "potential to emit” C02, EPA is also studying “the nature of the fuel combusted on site at the 'stack,' ” which does not involve off-site activity. Br. of Resp’ts 49. If EPA concludes it cannot consider off-site activity, it could adjust its regulation using only on-site activity like stack combustion.

. The majority opinion does not bar EPA from ultimately exempting biogenic C02 from PSD and Title V regulation. Instead, my colleagues strike down a temporary agency position almost certain to be recast. They thus threaten the "integrity of [the] administrative process ... by piecemeal review of the substantive underpinnings of a rule.” Pub. Citizen, 740 F.2d at 31; see also Am. Petroleum Inst., 683 F.3d at 388 ("[T]o the extent API and EPA dispute whether some sort of transfer-based exclusion for hazardous secondary materials is necessary to comport with the concept of 'discard,’ that issue also is best addressed once EPA finally decides whether to eliminate the transfer-based exclusion it adopted in the 2008 Rule.”).

. Tailoring Rule, 75 Fed.Reg. at 31,594 ("PSD preconstruction permitting requirements do not generally preclude a source from continuing actual construction that began before the source was a source required to obtain a PSD permit.”).

. The petitioners seem to concede that the hardship they face is remediable. Br. for Pet'rs 26 ("[E]ven if the plants commence construction under the illegal Exemption, upon a reversal of the Exemption they can be required to source more sustainably grown fuel and/or comply with more stringent limits requiring full operation and maintenance of their pollution control equipment.”).

. While Sahu avers that "many” of the six facilities "have not commenced construction,” he does not identify any of the “many.” Sahu Decl. 20.

. In discussing the hardship prong, the majority declares that "we have no idea how many biogenic carbon dioxide sources have been constructed since March 2012.” Maj. Op. 407-08. This assertion is way off the mark. The petitioners themselves could name only one source meeting the Deferral Rule exception. Their expert's affidavit isolated only eight, six of which might not fit the exception. See supra p. 423 & n. 9. If the petitioners have not been able to establish severe harm by now, we should not attempt to fill the jurisdictional gap in their challenge.

. As an aside — my colleagues do not address this point — what the petitioners complain of is not massive deregulation but instead temporary maintenance of the status quo. Significantly, the harm they allege does not come from unregulated biogenic C02 emissions; rather, their primary alleged harm is that the Deferral Rule allows for the less strict regulation of emissions of certain non-C02 pollutants (such as particulate matter and nitrogen oxides) from biogenic C02 emitters. But if a stationary source — biogenic or otherwise— has the potential to emit above-threshold amounts of a regulated pollutant other than GHGs, it must obtain a PSD permit and meet BACT not only for the pollutant(s) that made it subject to PSD but also for all pollutants emitted over certain thresholds (even for a pollutant not emitted in a quantity sufficient by itself to subject the source to PSD). See Deferral Rule, 76 Fed.Reg. at 43,493. While the Deferral Rule exempts from PSD a source whose biogenic C02 emissions alone make it subject to PSD, it does not allow a source with the potential to emit above-threshold quantities of other regulated pollutants to escape regulation. See id. at 43,492 ("This deferral applies only to biogenic C02 emissions and does not affect non-GHG pollutants or other GHGs ... emitted from the combustion of biomass fuel.”). The Deferral Rule's effect on PSD applicability, then, is minimal: as *424 noted earlier, it simply preserves the pre-July 2011 status quo. Before July 1, 2011, a stationary source was subject to PSD if it had the potential to emit certain quantities of pollutants other than C02. Under the Tailoring Rule, a source that was not otherwise subject to PSD became, as of July 1, 2011, subject to PSD based on its GHG emissions. The Deferral Rule exempts from this set of newly-regulated sources those subject to PSD based only on their biogenic C02 emissions. Preserving the status quo for this limited category for— now — only a matter of months does not constitute "immediate and significant” hardship.

. As my colleagues note, Maj. Op. 407-08, the Deferral Rule makes it optional for permitting authorities (e.g., states) not to regulate biogenic C02 emissions during the deferral period but they identify only a single state— Massachusetts — that continues to regulate biogenic C02 emissions. Maj. Op. 407-08. That only one permitting authority has seen fit to regulate biogenic C02 emissions during the life of the Deferral Rule underscores the reasonableness of EPA's decision to study the science before imposing burdensome regulatory obligations to achieve uncertain and potentially negligible benefits.